EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* VÍCTOR MANUEL DELGADO MELÉNDEZ, acusado y apelante.

*Número:* CR-72-50          *Resuelto:* 25 de enero de 1973

*José Torres Ortiz,* abogado del apelante; *J. F. Rodríguez Rivera, Procurador General Interino,* y *Federico Rodríguez Gelpí, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Acusado y convicto del delito de hurto mayor por una mayoría de once a uno del jurado, el apelante fue sentenciado a cumplir la pena de cuatro a siete años de presidio.

En apoyo de este recurso apunta que el tribunal de instancia incidió (1) en sus instrucciones sobre coartada y al instruir al jurado sobre el uso y propósito de la declaración jurada de la perjudicada; y (2) ". . . al no entregar o dar lectura para el Jurado de la Denuncia y las notas del Lic. Castillo Marín admitidas en evidencia." Además alega que incidió al denegar la moción de absolución perentoria y para dejar sin efecto el veredicto, ya que la identificación del apelante no se estableció más allá de duda razonable.

■ De entrada es necesario llamar la atención al juez sentenciador a que está obligado a seguir y aplicar la norma que establecimos en *Pueblo* v. *Moreu Pérez*, 96 D.P.R. 60 (1968), con respecto a instrucciones sobre la defensa de coartada. Al dar instrucciones al efecto de que "Si la prueba presentada para establecer una coartada deja de demostrar claramente que el acusado se encontraba en el sitio que alega y precisamente en el mismo momento de la ocurrencia de los hechos o que él no pudiera encontrarse en el lugar del delito al tiempo de ocurrir éste, la coartada ha dejado de establecerse." es aparente que dicho juez, o desconocía la norma de *Moreu Pérez* o, conociéndola, simplemente no la recordó por inadvertencia, o hizo caso omiso de la misma. Tal instrucción se dio a pesar de que, al terminar el juez sentenciador de dar su instrucción al jurado, la defensa en efecto le llamó la atención de que esa instrucción no era correcta. Este error perjudicial sería suficiente para dejar sin efecto la sentencia y ordenar un nuevo juicio.

■ Resulta, sin embargo, que la policía continúa actuando con respecto a la identificación de sospechosos en circunstancias como la de este caso, como si aún no hubiéramos establecido la norma de que tal identificación se practicará poniendo al sospechoso a la vista del que hubiere de identificarlo en unión de otras personas de circunstancias exteriores similares, de manera que en presencia de todas estas personas en tal rueda o grupo, o desde un punto en que no pudiese ser

visto, el que deba practicar el reconocimiento, manifestará si se encuentra en la rueda o grupo la persona a quien hubiese hecho referencia en sus declaraciones, designándolas en caso afirmativo clara y determinadamente. *Pueblo* v. *Gómez Incera,* 97 D.P.R. 249, 260 (1969). La policía venía obligada a aplicar esa norma en este caso ya que la identificación en el mismo se practicó el 5 de diciembre de 1970, o sea, unos seis meses con posterioridad a nuestra sentencia de 6 de mayo de 1970 en *Gómez Incera,* supra.

■ Las circunstancias de este caso requerían que la identificación del sospechoso se hiciera de acuerdo con la referida norma. El siguiente resumen de la prueba lo demuestra.

Mientras la testigo Srta. Haig y una amiga caminaban por la calle Caribe, entre la Avenida Ashford y la calle Magdalena, en el sector del Condado en el municipio de San Juan, como a las siete de la noche, la Srta. Haig oyó alguien corriendo detrás de ella, sintió algo que le dio en el hombro izquierdo, y un hombre le pasó quitándole la cartera de su mano. Esa noche era "entre medio" de claro y oscuro; había una luz indirecta. La Srta. Haig corrió tras el referido sujeto como 20 ó 25 pies, por unos segundos, separados el uno del otro por unos tres pies. En la esquina dicho individuo abordó un vehículo de motor conducido por otro. Se alejaron de allí rápidamente pero la Srta. Haig pudo recordar el número de la tablilla y el color amarillo claro del vehículo el cual era ni muy viejo ni muy nuevo, con capota dura del mismo color. La Srta. Haig dice que le vio la cara al hombre que le arrebató la cartera porque mientras corría éste se viró dos veces. A esos efectos el interrogatorio de la Srta. Haig fue el siguiente:

"R. Una vez bien ligeramente y después un poco más largo cuando vio que de veras yo estaba corriendo detrás de él.
P. Tenía alguna cicatriz en la cara o algo?
R. No.
P. Que no la tiene o no la vio?
R. Que yo no vi.

P. Pudo ver la forma de la boca?

R. Yo vi la forma de su cara y sus ojos.

P. Los ojos son achinados o grandes?

R. Ninguna de las dos.

P. Cómo eran los ojos?

R. No grandes ni pequeños, blancos, bien claros y el iris bien oscuro.

P. Esos son los ojos. La pupila y el iris bien claro, ni grandes ni chicos. Cuántas personas usted ha visto hasta el día de hoy con los ojos que responden a esa misma característica?

R. Ninguna.

P. Que tenga ojos negros, la pupila ni grande ni chica?

R. Yo no estaba mirando los ojos de nadie hoy.

.    .    .    .    .    .    .    .

R. El pelo no era estilo hippie, pero el estilo era un poco más largo, era más largo que corto, pero no el estilo hippie.

P. Y mirándolo de espalda, hasta dónde le llega ya el pelo, hasta el cuello de la camisa?

R. Hasta el cuello.

P. Hasta la parte superior o inferior del cuello, en la base acá?

R. No sé lo que quiere decir.

P. Sí, tenga la amabilidad de tocarse ella hasta qué sitio le llegaba el pelo?

R. En alguna gente es más corto, era un peinado normal, el pelo estaba normalmente, en una parte normal, la línea del pelo.

P. Tenía ondas el pelo?

R. Muy ondulado.

P. De dónde empezaban las ondas?

R. En la cabeza, superior.

P. Había visto ella en otras ocasiones a una persona con todo el pelo ondulado?

.    .    .    .    .    .    .    .

P. Esta persona con ese pelo ondulado en toda la cabeza, es la primera que usted ve una persona así?

R. No, mucha gente en Puerto Rico tiene cabellos así.

P. Y en Puerto Rico no ha visto personas con ojos negros, bien negros, azabache que le llaman?

R. Yo he visto mucha gente con ojos bien oscuros.

P. Ni grandes ni pequeños?

R. Yo he visto todo estilo de ojos, en todos los colores y estilos y también . . .

P. Color de los ojos más como ella cree que son?

R. Brown.

P. Dark or light?

. . . . . . . .

P. Si aparece de la declaración jurada algo sobre la identificación del acusado, o sea, de la persona?

R. Sí, cuando él viró, que yo claramente vi su cara.

P. Pero nada en cuanto a las características de la persona?

R. No me dijeron que tenía que escribir eso.

. . . . . . . .

P. Entonces usted . . . esta persona miraba hacia atrás mientras corrió o se detuvo?

R. No, él estaba corriendo y mirando hacia atrás, a mí.

P. Usted dijo que había mirado dos veces hacia atrás?

R. Una vez ligeramente y una por un tiempo más largo.

P. Por cuánto la primera vez?

R. Medio segundo.

P. Allí pudo ver alguna característica de esta persona, del físico, esa primera vez?

R. El perfil.

P. La segunda, por cuánto fue que dijo que lo vio?

R. Cinco o seis segundos.

P. Cinco o seis segundos en un trayecto de 25 pies?

R. Aproximandamente.

P. Y corrió la persona por seis segundos?

R. Yo estaba corriendo.

P. Y le vio las características entonces de esa persona por seis segundos?

R. Posiblemente era un poquito más largo que eso, no podía ser más corto tiempo, yo estuve un buen rato mirando al hombre.

P. Y habló del tiempo. Si fue menos tiempo?

R. No.

P. Fueron seis segundos o más?

R. Seis segundos o más."

Como el color del vehículo no aparecía en su declaración jurada, a preguntas de la defensa, la Srta. Haig testificó que

"me han informado que el auto es amarillo"; que se lo informó el abogado del dueño del auto.

La Srta. Haig testificó que al día siguiente de los hechos la policía la llamó y fue al cuartel. Allí volvió a ver al apelante. Su interrogatorio al efecto fue el siguiente:

"P. Y al acusado lo identificó también en un grupo de personas o no había grupo de personas, en un line up, que llaman?

R. No.

P. Estaba solo o estaba acompañado el acusado cuando usted supuestamente lo identificó?

R. Primero yo no sabía que ellos tenían al acusado. Cuando entré al Cuartel de la Policía lo vi sentado allí y cuando el policía entró al cuartel, yo le dije a él ...

P. Qué le dijo?

R. Ese es el hombre que me robó.

P. Y así lo dice la declaración jurada?

HON. JUEZ:

Un momentito, la intérprete no ha interpretado al español la contestación.

R. *A mi me dijeron que entrara al cuartel, habían dos hombres sentados allí y no estaba segura que uno de ellos fue el que me robó,* pero no podía ni pensar que el policía lo dejaría, un hombre como éste, sin tener cierta autoridad alrededor de él con todas las puertas abiertas y no había ningún policía en la estación, en el cuartel. (Énfasis nuestro.)

. . . . . . . .

R. Fuimos adonde estaba el policía y le dijimos que ese fue el hombre que me robó.

P. Quién fue la primera en hablar al policía?

R. Yo le hablé a ella primero y como ella habla más español que yo, pues ella habló al policía?

. . . . . . . .

R. Después que la dueña de la casa donde yo vivía le habló, *entonces el policía se viró y me preguntó si ese era el hombre y yo le dije que sí.* (Énfasis nuestro.)

P. Dónde estaba el hombre éste, cuando usted le dice al policía que ese era el hombre?

R. En el cuartel, al frente.

P. Ese señor estaba solo o acompañado o estaba en un grupo de otras personas cuando usted lo identifica?

R. A principio él estaba con un hombre más bajito.

P. Al momento que lo identifica?

.  .  .  .  . .  .  .  .  .  .

P. Cuando el policía le pregunta a ella si ése es el hombre, si es este hombre, el acusado estaba solo o estaba acompañado o estaba entre un grupo de otras personas?

R. El estaba sentado con otro hombre.

P. No es cierto que usted le dijera al señor policía, el hombre que está sentado al lado de ese otro fue el que me llevó mi cartera?

R. Sí.

P. Entonces, no es que el policía le pregunta si ese era el hombre?

R. Yo no sé lo que la dueña de la casa le dijo en español, pero *el policía me preguntó; ¿ese es el hombre? Y yo le dije que sí, indicando uno de los hombres que era el hombre.* (Énfasis nuestro.)

P. Indicando, pero no diciéndole; el hombre sentado al lado de ese otro es el que me llevó la cartera? Si esa expresión la hizo o no la hizo?

R. No, yo no indiqué hasta más tarde.

P. A pesar de que el policía le había hecho una pregunta señalando que. . . . ?

R. No estaba en el mismo salón cuando me preguntó eso el policía.

P. Entonces, cómo ella sabía a quién se refería el policía si no está en el mismo salón?

R. Habían nada más que dos hombres allá dentro." (Énfasis nuestro.)

■ Las circunstancias que hacían imperativo aplicar la norma de *Gómez Incera,* supra, a este caso, son las siguientes:

1.—Los hechos ocurren en una semiobscuridad.

2.—La Srta. Haig le corre detrás al sospechoso por unos 20 ó 25 pies, cosa de segundos. Su testimonio es que le vio la cara porque él mantuvo su cara virada hacia ella durante unos 5 ó 6 segundos mientras corría hacia adelante, es de

dudosa credibilidad pues resultaba, de ser esto cierto, que durante casi todo el trayecto el sujeto que le quitó la cartera a la Srta. Haig corrió de espaldas hasta el vehículo hacia el cual se dirigía.

3.—Los detalles de la cara y vestimenta del sospechoso no se relacionaron en la declaración jurada de la Srta. Haig.

4.—En contraste con su buena memoria con respecto a los hechos del caso y de la identificación, no recordaba dónde y bajo qué circunstancias "creía" que había visto al Lic. Castillo Marín. Resulta que éste asistió al sospechoso en la vista preliminar y allí vio y oyó declarar a la Srta. Haig. Su interrogatorio al efecto fue el siguiente:

"P. Sin referirse a sus notas, usted recuerda si esta Srta. Doris Jaig [*sic*], en cuanto a Víctor Manuel Delgado Meléndez, en la vista preliminar lo identificó positivamente?

R. No entiendo la pregunta.

P. Si hubo una identificación positiva de la señorita Haig en cuanto a Víctor Manuel Delgado Meléndez, cuando usted le preguntó si lo conocía o no?

R. En la oficina del Juez?

P. Sí, en la vista preliminar.

R. *En la oficina del Juez, ella declaró que había visto una persona, uno de los acusados. Primeramente dijo que era el otro acusado contra el cual no hubo causa probable y después dijo que no, que era éste aquí presente, señor Víctor, que lo había visto por allí por el sitio.*

P. Pero primero dijo que fue el otro?

R. *Primero dijo que fue el otro y después dijo que fue éste.*

P. En algún momento ella dijo que no conocía a Víctor Manuel, al acusado?

R. Perdón?

P. Si en algún momento en esa vista, ella dijo que no conocía ni había visto a Víctor?

R. Por eso, dijo que no lo conocía. Había visto por el sitio donde ella vivía el otro y luego dijo que era éste.

. . . . . . . .

P. Cuál fue la persona que ella señaló como la que le arrebató la cartera el 4 de diciembre de 1969 en la Avenida Ashford?

R. El aquí acusado.

P. Lo señaló y dijo que, ese es?

R. Sí, señor.

. . . . . . . .

P. Originalmente esta señorita Haig señaló a este acusado como que fue el que le arrebató la cartera, en la vista preliminar?

R. En la vista preliminar.

P. Al preguntarle si conocía a Víctor Manuel como el que le había arrebatado la cartera, qué fue lo que dijo ella originalmente?

R. Ella habló de que conoció . . . Se le preguntó específicamente que si conocía alguna de estas personas de antes de los hechos. Ella dijo primero que había visto a este señor Víctor anteriormente por el sitio donde ella vivía y posteriormente, perdón, había visto primero . . . primero dijo que había visto al otro señor por el sitio donde ella vivía y que lo conoció de vista y luego dijo que no, que era a este otro señor, a Víctor. Es la misma pregunta que se había formulado."

En vista de lo expuesto, *debe revocarse la sentencia dictada en este caso el 30 de septiembre de 1970 por el Tribunal Superior, Sala de San Juan, y absolverse al apelante.*

Los Jueces Asociados, Martínez Muñoz y Martín, disienten.